UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

CASE NO:22-80099-CR-AMC

UNITED STATES OF AMERICA

v.

DANIEL ELIE BOUAZIZ,

    Defendant.

_____/

## DEFENDANT BOUAZIZ'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE FROM THE ADVISORY SETENCING GUIDELINES AS CALCULATED IN THE PSI REPORT

    COMES NOW, the Defendant, DANIEL BOUAZIZ, by and through his undersigned counsel, and respectfully requests this Honorable Court to impose a non-guideline sentence based upon the factors set forth in 18 U.S.C. Sec. 3553(a). For the reasons stated herein, defense submits that a variance from the PSI's proposed guideline sentence should be granted below the adjusted offense level calling for 63-78 months for Mr. Bouaziz, so as to insure that a reasonable sentence is imposed that is not greater than necessary, using all of the statutory considerations.

    This Memorandum in Aid of Sentencing is being filed pursuant to Rule 32 of the Federal Rules of Criminal Procedure. The Defendant is requesting that this Court consider all materials contained within, and after computing an Advisory Guideline range, fashion an appropriate and reasonable sentence. Pursuant to Booker vs. United States, 543 U.S. 220 (2005), the Defendant,

1

Daniel Elie Bouaziz, would respectfully request this Honorable Court consider a downward variance from the guideline range from his adjusted offense levels.[1]

## Grounds for Variance

The Defendant is asking this Court to fashion a reasonable sentence, and, in consideration of the Defendant's conduct, as a whole, would ask that those sanctions in Title 18, United States Code, § 3553(a), be considered. Title 18, United States Code, § 3553(a) provides, in relevant part:

Factors to be considered in imposing this sentence – the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider-

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range established …;

---

[1] There are objections to the PSIR, filed at D.E. 84 which are left to be adjudicated by this Honorable Court.

2

(5) any pertinent [Sentencing Commission] policy statement …;

(6) the need to avoid unwarranted sentence disparities among the defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

The Defendant would respectfully submit that a variance from the Guideline Range is appropriate in this case. In the Sentencing Reform Act of 1984, Congress set forth a panoply of factors to be considered by Courts in determining an appropriate sentence. One of these factors was the sentence prescribed by the Guidelines. It was only one among many. It has been noted that the Guidelines "either reject or ignore" many of the other § 3553(a) factors. United States vs. Ramum, 353 F. Supp. 2d 984, 986 (E.D. Wisc. 2005).

The United States Supreme Court solved this problem in Booker, supra. By excising the position of the Sentencing Reform Act that required sentencing courts to follow the Guidelines, the Court created an "Advisory" regime under which the Guidelines should still be considered by Courts, but do not automatically control the ultimate sentencing determination. As Justice Bryer observed, this new discretionary regime "requires a sentencing court to consider Guideline ranges, see § 3553(a)(4) (Supp. 2004), that permits the Court to tailor a sentence in light of other statutory concerns as well. See § 3553(a) (Supp. 2004), and United States vs. Booker, 125 S. Ct. 757. The result was that the Supreme Court expressly authorized sentences to fall outside the Advisory Guideline range, so long as such sentence (like all sentences) are reasonable. The undersigned counsel would submit that the Pre-Sentence Investigation Report recommending a sentence of 63-78 months is not in keeping with the guidance of Booker, supra, and certainly is not appropriate in this instance.

### A. **The Nature and Circumstances of the Offense**

1. Bouaziz guaranteed all of his sales with all clientele.

The Defendant owned and operated two upscale art galleries in Palm Beach County for several years. During that time period, it was always related to customers that if they did not like their purchases, they were free to return them within the first five years. This same statement was given by Bouaziz to the UCE during the course of the undercover's repeated visits to his gallery. Art is truly subjective, and the Defendant, knowing this, and standing by his pieces, made this extraordinary money-back offer. As evidence of the genuine intent of the Defendant to abide by this generous warranty, the PSI accurately details that there were two buyers (Messrs. Leon Oaks [Victim 4] and Lawrence Moens [Victim 6]) who were reimbursed for the art pieces that they bought from Defendant at a time before Bouaziz was even aware of a federal investigation into his practices.[2] Further, the sum of money returned was substantial - $290,000 to Mr. Oaks and $120,000 for Mr. Moens, for a total of $410,000. In effect, Bouaziz returned to clientele, monies, totaling almost one-third of what the Government and the defense agreed upon as the intended loss in their Plea Agreement[3], and at a time when Bouaziz was under no real legal obligation or some self-interested desire to prospectively insulate himself from criminal conduct in the eyes of law enforcement.

Thereafter, and following the execution of the search warrant, Bouaziz re-paid a total of $246,000 to customers within the first five months. (Jennifer Stanton and Sean Hayes [Victim 1 $95,000; Donna Nero [Victim 3] $100,000; Joseph Shabani [Victim 5], $21,000; Frank Seminara [Victim 10], $30,000.

---

[2] The Government must concede that Bouaziz's first awareness that he may have been a target of a federal investigation was during the conduction of a search warrant at his galleries in December of 2021. Oaks and Moens were reimbursed in full prior to this time.
[3] That figure was that the intended loss was greater than $550,000 but less than $1.5M

Subsequent to Defendant's Plea of Guilty, and after being given time by this Honorable Court, he was able to raise, through lawful means, the sum of $600,000 through family loans, which are being disbursed to the remainder of victims out of the undersigned's trust account. The undersigned has been in regular contact with these victims and the Government to assure payment. The aim is to finish paying all but victim 8, Dr. & Mrs. Gorenstein, due to the larger amount that is owed to them, prior to sentencing on May 30, 2023, although they will be partially repaid in an undetermined amount, prior to sentencing.[4]

2. Defendant has assured that all victims will be repaid within 45 days of sentencing.

In an effort to demonstrate his remorse for the crimes of which he was accused, the Defendant has gone to extraordinary lengths to assure full restitution is paid to the victims. Some of these individuals were not mentioned in the PSIR as victims, and are not victims, but rather had been contacted by law enforcement as part of their investigation. Being uneasy about the stigma attached to the Defendant and his gallery from press coverage as well as contact with the FBI, they have elected to have themselves reimbursed, in full for all works of art purchased from Danieli Fine Art. This is a decision that was agreed upon by Mr. Bouaziz due to his commercial policy of guaranteeing his art, coupled with a desire to assure that all individuals were made whole.

3. Art is intrinsically subjective and can be easily misidentified as a genuine work of the artist.

---

[4] The Defendant, with the Government's knowledge has an existing contract for sale (cash, with no financing) on commercial property located in Palm Beach County. This is property that is scheduled to close, pending Court order, in the first week of July 2023. This property is subject to a Governmental lis pendens. The funds that represent seller proceeds will be deposited into the undersigned's trust account, and Victim 8 will be refunded his entire purchase price along with the Stipulated forfeiture amount of $200,000 reflected in the plea agreement.

Defendant makes no effort to hedge on his offer to plead guilty, and takes responsibility for selling counterfeit artwork, as well as altering the provenance of pieces of art sold to his customers. He has and will, when appearing before this Court, express his remorse. That having been said, the world's leading art houses, including the prestigious Christie's and Sotheby's have been the subject of lawsuits brought by buyers, who, following their purchase(s) at auction, sought authentication of the works purchased, and were surprised to learn that an expert felt they were counterfeit. Exhibit "A" attached herewith is a composite of just two examples of such commercial litigation that resulted from purchases made by buyers against the two legendary auction houses.[5] The internet is replete with these types of claims. What is also distinguishable is that they regularly litigate such actions. In contravention, the Defendant simply told customers, that he would refund their money upon request. Unlike many commercial warranties/guarantees, Bouaziz meant what he said and did what he promised, even prior to knowing he was in the cross-hairs of a federal criminal investigation.

4. The UCE's discussion of purchases from Defendant artificially inflated the normal and customary sales of the Defendant as part of his charged criminal conduct and should be viewed as an outlier for his conduct.

Although sentencing entrapment is not an accepted principle under 11th Circuit caselaw, it is a concept suitable for consideration by this Honorable Court as a basis for reviewing the nature and circumstances of the offense. The total amount of money realized by Bouaziz for what has been listed in the PSIR as Victims 1-12 is $1,365,070. For 12 victims, the average

---

[5] Ironically, the lawsuit against Christie's, memorialized in the attachment, concerned a fake Basquiat. This is the same artist that the Defendant was attempting to sell to the UCE in the above-styled cause of action.

6

sale price realized by Bouaziz was $113,756.[6] The agent negotiated a range of possible sale items that sought to artificially aggravate the Defendant's sentence, knowing that these large numbers, far exceeding any of the other clientele, would increase the Defendant's legal exposure to a considerably higher level under the guidelines. In fact, as discussed in Defendant's Objections to the PSIR, the Government and defense had agreed to recommend an intended loss figure of 6-levels lower than what Mr. Bouaziz now faces, understanding that the Court has yet to rule on the objections. Whatever the Court's ruling on those objections, the transactions discussed between Bouaziz and the UCE were not reflective of the Defendant's day to day conduct, but rather over-represented his criminal conduct.

5. Bouaziz made no attempts to obscure his assets or conceal his true identity and maintained a sufficient net worth that could be used to satisfy customer's requests for refund(s).

As a condition of Defendant's bond and release, the Government, as early as May of 2022 provided to the Court, through probation, the identities of at least 11 pieces of real property that were owned directly in the name of Daniel Bouaziz. Additionally, there were six vehicles, including 4 high-end sports cars, and two vessels – all held in the individual name of Daniel Bouaziz. His bank accounts were either in his individual name or in the name of two or more Florida registered corporations. Mr. Bouaziz's name was associated with all of these corporations and bank accounts. Never were there efforts made to disguise these assets or transfer them to another entity so as to conceal to whom they belonged, or to prevent any future creditor from seeking their attachment or garnishment. The Government seized

---

[6] This includes Dr. & Mrs. Gorenstein's purchases, totaling $465,000, that was, itself, far higher than the average sales.

hundreds of pieces of art from his gallery during the search warrant execution. Those items are invaluable.[7] Nevertheless, the value of the remaining items not discounted by experts is substantial. The point is that Mr. Bouaziz kept assets, originating from lawful activities, that were more than substantial enough to pay any patron who wanted their money to be returned to them, and he has a track record to demonstrate that that was his intention to do so, if necessary. His assets assured that this would occur, even had the UCE successfully closed on the negotiations for the other pieces.

## B. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Daniel Bouaziz is a 69-year-old married man with grown children, and who will turn 70 years of age in September of this year. He is a not a U.S. Citizen, and knows, that in addition to the possible jail time he faces, will ultimately be removed from the U.S. based upon his conviction. He has no prior history of arrests, although he has received a few driving infractions relative to Driving with a suspended License.

Besides his age, Defendant has a significant medical history. His general physician, whose letter to the Court is attached in the separately filed Notice of Filing letters in support of sentencing detail a significant heart problem that may not adequately be administered to in prison. Mr. Bouaziz is overweight, being 5'8" and 250 pounds. He has circulatory problems and had to have surgery to remove venous blockages in years past. He has high blood pressure and chronic prostate disease.

---

[7] Defense concedes that there are pieces within that trove of art that have been held by experts consulted by the Government to be reproductions or counterfeit.

The Sentencing Reform Act also instructs the Courts to consider the "history and characteristics of the defendant." Apart from consideration of criminal history, the mandatory Guidelines gave Courts little room to satisfy this statutory mandate, and almost no room to consider the positive traits of an accused. In rendering the Guidelines advisory, Booker, supra, properly restored the Court's discretion to take into account the whole person when meting out punishment. See, generally, United States vs. Ramum, 353 F. Supp. 2d 986: "In cases in which the defendant's history and character are positive, consideration of all the § 3553(a) factors might call for a sentence outside the Guideline range."

A. Daniel gives back to his community, and to philanthropic organizations, his Temple and to young artists that are seeking to broaden their abilities and expand the number and quality of patrons to which they may be exposed.

Defendant is separately attaching approximately 45 letters from individuals whose lives he has touched in a variety of ways. Daniel is first and foremost dedicated to art and its conservation. He individually sponsored the 1st Annual West Palm Beach 2016 Art Festival. He bought 40 shipping containers to allow beginning artists to have a space/gallery to do and promote their artwork. (Exhibit B). Mr. Bouaziz also regularly paid for artist's room and board. These included names such as Federico Massa lena Cruz, Raphael Thierry and Christian Volckman, among others who went on to a successful career in art. (Exhibit C). Defendant is separately attaching advertisements, Facebook postings, and other social media coverage of this and other philanthropic efforts by Mr. Bouaziz. He sponsored a fashion show for the charity aimed at improving the lives of children that were the subject of physical, sexual and emotional abuse. He has organized a Toys for Tots event that was able to assure 1000 toys for children from lower income families. (Exhibit D). Mr. Bouaziz also organized and sponsored 2-3 fundraisers for Achilles International Organization at his original gallery at 925 Railroad Avenue. (Exhibit E)

According to Wikipedia, Achilles International Achilles International, formerly known as the Achilles Track Club, was established by Dick Traum in 1983 to encourage people with disabilities to participate in mainstream athletics. Achilles has become an international organization that provides support, training, and technical expertise to people at all levels. They welcome people with all kinds of disabilities, such as: visual impairment, stroke, cerebral palsy, paraplegia, quadriplegia, arthritis, amputation, multiple sclerosis, cystic fibrosis, cancer, traumatic head injury, and many others. With the help of volunteer guides, athletes participate in workouts and races using crutches, wheelchairs, handcycles, prostheses, or without aid at all. These and other Charitable events were captured on social media (Exhibit F)

B. Daniel is a man of service to those in need.

Generosity of spirit is a terminology rarely used to define a person, yet Daniel's colleagues and friends routinely turn to that explanation for a man who seeks out the those in society that need assistance. The Court will hear at sentencing that not only does he volunteer his time talents and treasure, but he enlists the help and support of his family, employees and synagogue constituents to make his philanthropic efforts successful. Daniel would routinely sponsor and cater events for synagogue congregants at his gallery. (Exhibit G)These are expected to be talked about by Rabbi Moshe Scheiner at sentencing, but one such event is documented as social media advertising for the Purim Masquerade Party that was hosted and catered by Daniel on behalf of the Palm Beach Synagogue.

To promote the arts, Daniel has also performed at numerous concert halls around the world, including the local Dreyfoos Hall at the Kravitz Center for the Performing Arts, where he appeared as a featured tenor. (Exhibit H).

ACKNOWLEDGEMENTS AND LETTERS OF REFERENCE

Defendant has filed under separate cover, numerous letters of support from colleagues and friends, whose lives have been touched by the Defendant's generosity of time, talent, spirit and treasure. The common thread that runs through each of these letters, and those prepared to orally address the Court at the time of sentencing, is the highest level of selflessness. These letters and the events chronicled are not contrived instances of an individual seeking to benefit and curry favor at an upcoming Federal Sentencing hearing. On the contrary they clearly demark that rare person who puts others before themself, and more poignantly colors the world around them with hope – all the while refraining from seeking praise or adulation. It is not an overstatement to say that any term of incarceration imposed by this Court would serve to diminish the community that benefits from Daniel's contributions on a regular basis. They also span an endless number of years. These indices of Daniel's personal history and characteristics belie the notion of the nature and circumstances of the offense that he was simply an opportunist, motivated by avarice, when he started his galleries.

## ADJUSTMENTS FOR ACCEPTANCE OF RESPONSIBILITY AND FOR SUBSTANTIAL ASSISTANCE

Daniel has been given credit for his acceptance of responsibility. This is just as he made an early determination to plead guilty and try to rectify his mistakes by assisting the U.S. Government in assuring victims were made whole. More succinctly, his friends will speak to the Court at sentencing of his candor in admitting to a grievous error in judgment, and more poignantly, his overwhelming remorse for his decision to break the law.

## IMPOSING A SENTENCE WELL BELOW THE ADVISORY GUIDELINES

There has been a tremendous interpretation of various factors in individual defendants' backgrounds as indicated by the wealth of case law which exists on the issue of a reasonable sentence. There are many cases around the nation in which courts have upheld sentencing variances based on a particular individual's situation and characteristics. The Defendant is respectfully requesting the Court consider the following examples:

(a) In <u>United States v. Santoya</u>, 493 F. Supp. 2d 1075 (E.D. Wisc. 2007), a sentence below the Guidelines was upheld because the defendant, "had significant positives in his character and background as evidenced by the letter from his family and fiancée which the Guidelines did not take into account because the judge is 'permitted to consider the entirety of the defendant's background and character, not just the negatives reflected in his criminal history.'"

(b) In <u>United States v. Wachowiak</u>, 412 F. Supp. 2d 958 (E.D. Wisc. 2006), held the sentence below the Advisory Guidelines and noted: "The Guidelines fail to consider the defendant's otherwise outstanding character, as depicted in the many supportive letters ..., while § 3553(a)(1) requires the Court to consider the character of the defendant, the Guidelines account only for criminal history. In a case where the defendant led an otherwise praiseworthy life, the Court should consider a sentence below the Advisory range ...."

(c) In <u>United States v. Willis</u>, 479 F. Supp. 2d 927 (E.D. Wisc. 2007), involved a drug case where the Advisory Guideline range was 120 months, but the statutory maximum was 60 months. It was determined at the defendant's sentence that one year and one day was sufficient, in part because: "The sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself."

(d)     In <u>United States v. McGee</u>, 479 F. Supp. 2d 910 (E.D. Wisc. 2007) was a heroin distribution case. The Advisory Guideline range was 21 to 27 months. Again, the Court sentenced to a year and a day and noted because the defendant "had never before been to prison and generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time, yet continues to reoffend."

(e)     Most recently, in <u>United States v. Libby</u> (citation omitted), the defendant was convicted of perjury and obstruction of justice. He had received a 30-month Guideline sentence, which was commuted by President Bush. It was noted that the conviction was "harsh" where "the reputation of years of public service and professional work in the legal community is forever damaged [and where] the consequences of the felony conviction on his former life as lawyer, public servant and private citizen will be long lost."

(f)     <u>United States v. Adelson</u>, 441 F. Supp. 2d 506 (SDNY, 2006), was a security fraud case. A 42-month sentence was imposed as opposed to a life sentence which was called for by the Advisory Guidelines. This was done in part because of the accused past integrity and any good deeds. The Court noted, "But, surely, if ever a man was to receive credit for the good he has done, and his immediate misconduct assessed from the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed Courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'."

## BOUAZIZ IS BEING TREATED IN VIOLATION OF FEDERAL SENTENCING STATUTES AND IS SUFFERING BOTH PROCEDURAL AND SUBSTANTIVE DUE PROCESS VIOLATIONS SHOULD THE COURT FOLLOW THE PSIR'S RECOMMENDATION AS TO INTENDED LOSS

Section § 3553(a)(6) of Title 18 specifically directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Well-founded claims of unwarranted sentencing disparity "assume that apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quotation omitted). Thus, § 3553(a)(6) applies only when comparing sentences among defendants "who have been found guilty of similar conduct." See *United States v. Martin*, 455 F.3d 1227, 1241 (11th Cir. 2006) (emphasis in original). In the Southern District of Florida, U.S. District Court judges are split on their instruction to U.S. Probation when preparing a PSIR for a defendant appearing before them that has pled guilty to an offense with the existence of a recited joint recommendation as to intended loss or a joint recommendation as to an amount of narcotics.

It is known the District Court judges sitting in West Palm Beach have directed U.S. Probation officers appearing before them to follow the joint recommendations of the parties as it relates to intended loss in a matter whose guidelines fall under U.S.S.G. Sec. 2B1.1.[8] Obviously, this is a treatment different than that which has befallen the defendant before the Court at sentencing. U.S. Probation has gone against the recommendation of the parties for an intended loss of between $550,000 and $1.5M, jumping up to an amount greater than $9.5M but

---

[8] It is also believed that additional U.S. District Court judges in the Southern District of Florida also abide by the direction to follow the joint recommendations of the parties as to an intended amount of loss under U.S.S.G. Sec. 2B1.1

less than $25M. The resultant increase in base offense level is 6 levels (from 14 points for additional specific offense characteristics for what was to have been the jointly recommended loss, to 20 additional specific offense characteristic points). Had Mr. Bouaziz been indicted and given a randomly selected judge in West Palm Beach, he would be looking at a Guideline sentence of 24-30 months. Instead he is looking at a figure that is over double what the high end of the guidelines would have been had the parties' joint recommendation for loss been followed.

Certain jurists can certainly look at a case differently, and one judge may view the need for punishment is greater than one of his or her colleagues. That is to be expected, and no defendant can cry foul. However, this situation highlights why there is a sentencing disparity that should be rectified by this Honorable Court to ensure a sentence that generates parity. As highlighted in the *Docampo* and *Martin cases, supra,* § 3553(a)(6) applies only when comparing sentences among defendants "who have been found guilty of similar conduct." *Martin @ 1241.*

Defendant's whose cases find their way before a judge in West Palm Beach are in fact treated differently to one appearing in Ft. Pierce despite being charged with money laundering or wire fraud. These cases cannot be looked at without clearly seeing that they are otherwise "apples to apples" Docampo @ 1101. Therefore, the sentencing statute as well as substantive due process dictates that this Court address that disparity at the time of Mr. Bouaziz's sentencing.

SOME ADDITIONAL THOUGHTS

Given the vast amount of post-Booker, supra, case law, the Defendant would submit that this Court has the authority, discretion and the inherent ability to sentence the Defendant below the Advisory Guideline range. "Under the Advisory Guidelines, a sentencing court is free to

consider any fact relevant to § 3553(a). A Court is not barred by the fact that a particular factor is discouraged or even forbidden by the Guidelines."

In 2007, the United States Supreme Court decided Rita vs. United States, 2007 W.L. 1772146, 127 S. Ct. 2456 (2007), and noted, "The sentencing Court does not enjoy the benefit of a legal presumption that the Guideline sentence should apply."

For all the above-referenced reasons, the Defendant would respectfully request that he be granted a sizeable variance from the applicable Advisory Guideline Sentence.

I HEREBY CERTIFY that a true copy of the foregoing has been sent to all parties of record by CM/ECF this 25th day of May, 2023.

HOWARD J. SCHUMACHER, P.A.
1 E. Broward Blvd., Suite 700
Ft. Lauderdale, FL 33301
(954) 356-0477
FL Bar No: 776335

BY: /S/Howard J. Schumacher
HOWARD J. SCHUMACHER, ESQ.